UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
832 CORPORATION, INC., 225
CORPORATION, INC., and THE         HONORABLE JOSEPH E. IRENAS
JOHN ADAMS CLUB, INC.,

      Plaintiffs,                   CIVIL NO. 04-1140 (JEI)

      v.                                    OPINION

GLOUCESTER TOWNSHIP,

      Defendant.
```

**APPEARANCES:**

SIRKIN, PINALES & SCHWARTZ LLP
By: H. Louis Sirkin, Esq.
Jennifer M. Kinsley, Esq.
Candace C. Crouse, Esq.
105 West Fourth Street, Suite 290
Cincinnati, Ohio 45202
     Counsel for Plaintiffs.


Everett Jones, Esq.
519 Market Street
Camden, New Jersey 08101
     Counsel for Plaintiffs.


PARKER MCCAY, P.A.
By: John C. Gillespie, Esq.
Elizabeth M. Garcia, Esq.
7001 Lincoln Drive West
3 Greentree Center
Marlton, New Jersey 08053-0974
     Counsel for Defendant.

**IRENAS**, Senior District Judge:

Plaintiffs 832 Corporation, Inc., 225 Corporation, Inc., and the John Adams Club, Inc. ("Plaintiffs"), brought the instant action challenging the constitutionality of Gloucester Township ("Township") Ordinance O-99-04 ("Ordinance"), which regulates adult businesses.  Presently before the Court are the cross-motions of Plaintiffs and the Township for summary judgment.

## I.

### A.  Gloucester Township Ordinance O-99-04

The Township adopted the Ordinance on February 22, 1999. The Ordinance created a comprehensive licensing scheme to regulate "adult-use establishments" within the Township's borders.  The Township specified that its purpose in enacting the regulations was to address the "adverse secondary effect" such businesses have on the community.  (§ 24.1.)  The Ordinance enumerates various secondary effects including "depreciation of property values, deterioration of neighborhoods, increase in incidences of crime, increase in blight, increases in vacancy rates of residential and commercial areas and increases in litter, noice and the interference with property owner's enjoyment of their property located in the vicinity of Adult Use Establishments."  (*Id.*)

2

The Ordinance requires all adult use establishments to obtain operating licenses issued by the Township, pay a license fee and abide by certain restrictions on the location of the business, operating hours, advertising and signage, interior lighting and construction, and inspection of the premises.  Adult use establishments are defined as adult book, novelty or video stores, adult arcades, adult entertainment cabarets, adult motels, adult motion picture theaters, and adult theaters. (§ 24.2.)  Given the extent and length of the Ordinance, the Court will not replicate it here but will quote from the Ordinance where relevant in discussing the parties' claims.

Of particular relevance here is the Ordinance's definition of an adult entertainment cabaret, which the Township maintains is applicable to Plaintiffs' business.  When the Ordinance was adopted, such a business was defined as:

> A nightclub, bar, restaurant or similar commercial
> establishment which features:
> 1.  Persons who appear in a state of nudity
> 2.  Live performances which are characterized by
> exposure of specified anatomical areas[1] or specified
> sexual activity[2]

---

[1]
  Specified anatomical areas are defined in Section 24.2 as:
      Less than completely and opaquely covered human genitals, pubic
      region, buttock, or female breast below the point immediately
      above the top of the areola [sic].
      Human male genitals in a discernable turgid state, even if
      completely and opaquely covered.

[2]
  Specified sexual activities are defined by Section 24.2 to include the
following:
      1.  The fondling or erotic touching of human genitals, pubic

3

> 3. Films, motion pictures, video cassettes, slides or
> other photographic reproductions which are
> characterized by the depiction or description of
> specified sexual activities or specified anatomical
> areas.

(§ 24.2.)  On April 23, 2001, in the midst of the events related

to the instant matter, the Township amended this definition to

specify that it includes any such establishment which "features

or permits" the listed activities.  Gloucester Township Ordinance

0-01-11.  The amendment also added a fourth category to the list,

encompassing "[a]ctivities by persons which are characterized by

exposure of specified anatomical areas or specified sexual

activities."  *Id.*

The Ordinance also includes sections regarding the

definitions of the relevant terms, licenses required and duties

of applicants, issuance of licenses, license fee, location of

adult use establishments, development standards and use

regulations for such businesses, inspections of adult use

establishments, the suspension, revocation and transfer of

licenses, and enforcement of the ordinance.  A June 9, 2003,

amendment to the Ordinance added a provision to the section on

the licenses required and duties of the applicant.

---

region, buttock or female breast.
2.  Sex acts, normal or perverted, actual or simulated, including
intercourse, oral copulation or sodomy.
3.  Masturbation, actual or simulated.
4.  Excretory functions as a part of or in connection with any of
the activities set forth in subsections 1 through 3.

4

### B.  Plaintiffs' license application and business

On September 5, 2000, Plaintiff 225 Corporation filed an application for a Mercantile License[3] with the Township to operate an establishment at 834 Black Horse Pike in a building that had previously housed the nightclub Club Fiji. (Def. Br. Ex. D.)  The application lists the name of the business as "225 Corporation, Inc. d/b/a The New Club Fiji" and describes the type of business as "restaurant (catered) NIGHTCLUB." (*Id.*)(Emphasis in original.)  Alvin Pearis is listed as the sole owner of 225 Corporation.  (*Id.*)  Plaintiff 832 Corporation, Inc., is listed as the owner of 834 Black Horse Pike.  (*Id.*)  Plaintiff John Adams Club, Inc., is not listed on the application.

Assistant Municipal Township Clerk Ann Quintavalle sent a letter to Pearis on September 18, 2000, asking for a "more definitive answer from you as to the type of establishment you will be operating." (Def. Br. Ex. F.)  At some point in September, 2000, Quintavalle also provided a copy of the Ordinance to Nancy Hart-Esposito, Esq., counsel to 225 Corporation.  (Quintavalle Cert. ¶ 4, Def. Br. Ex. E.)  Quintavalle stated in an affidavit that she provided Hart-Esposito with the Ordinance because "[Hart-Esposito] was unable to descirbe the type of establishment that would be installed at

---

[3]   Mercantile licenses are governed by a separate section of the Township's municipal code.

5

the Club Fiji." (*Id.*)  Quintavalle also stated that Hart-Esposito had "implied" that the New Club Fiji "may be used for adult purposes." (*Id.*)

In an October 9, 2000, letter to Quintavalle, Pearis wrote that "[i]t is my intent to have a food and beverage facility that is open to the general public." (Def. Br. Ex. G.)  Pearis further stated that food would be prepared off-site and brought to the New Club Fiji for retail sale, but he had not yet determined whether he would secure a liquor license for the business. (*Id.*)

Pearis and various Township officials exchanged several letters, and a meeting was held between Hart-Esposito, the Township Solicitor and other Township officials on November 22, 2000. (Def. Br. Ex. H.)  This correspondence culminated in a December 19, 2000, letter from Pearis to Bernie Shepherd, a Township official, in which he "amend[ed] and clarif[ied]" the description of his business in the original license application:

> 1.  It is my intent to have a non-alcoholic nightclub that serves food and beverages prepared off premises. I have not ruled out the possibility of obtaining a liquor license and food license in the future.
> 2.  There will be either a disc jockey or live music with a designated dance floor, the same as Club Fiji used.
> 3.  The tables and chairs will be set around the dance floor and existing bar area, but will not be in a fixed location and will be movable by patrons and staff the same as they were for Club Fiji.

    4.  I will use the existing lighting in place that was
used by the previous nightclubs, Club Fiji and Omar's,
at the location.[4]

(*Id.*)  Pearis further stated that "[t]his facility will be
operated the same as a nightclub that does serve alcoholic
beverages."  (*Id.*)  He also stated that he would rent the
facility to individuals for "weddings, birthday parties, dances,
fundraisers, holiday celebrations and the like."  (*Id.*)

    On February 23, 2001, the Township issued a Mercantile
License to 225 Corporation, operating under the trade name "The
New Club Fiji," for a "non alcoholic nightclub-food & beverages
prepared & supplied off premises."  (Def. Br. Ex. I.) Shortly
thereafter, the Township Police Department received information
that the New Club Fiji was operating as an adult use
establishment, and began an investigation in April, 2001.  (Def.
Br. at 6, Smith Cert., Def. Br. Ex. K.)  The Police Department
discovered an advertisement on the website "Swingersusa" for
parties at Plaintiffs' establishment.  (Def. Br. at 7, Def. Br.
Ex. J.)

    On April 7, 2001, Tracey Holmes, a Township police officer,
and two investigators from the Camden County Prosecutor's Office
("CCPO") attempted to gain admittance to Plaintiffs'

---

[4]  Neither party has provided a description of the original Club Fiji or
Omar's, but it appears that they were not adult use establishments.

7

establishment but were denied access because they were not on the guest list. (Holmes Cert., Def. Br. Ex. L.)  Holmes, Fawn Landay and Robert Ferris, CCPO investigators, were admitted to the club on April 14, 2001, as they had placed their names on the guest list by sending an email to the website.[5]  (*Id.*)  They did not pay an entrance fee.  (Landay Cert., Def. Br. Ex. M.)

During the April 14, 2001, visit, Holmes, Landay and Ferris toured the club.  (Holmes Cert., Landay Cert.)  The woman giving the tour referenced certain rooms where guests could have sex, and showed them rooms with mattresses on the floor.  (*Id.*)  They also observed a woman exposing her breasts, a couple fondling each other's genitalia and several patrons engaging in sexual intercourse.  (*Id.*)

On April 21, 2001, Holmes, Landay and Ferris again visited the club and were not asked to pay a cover charge.[6]  (*Id.*)  They observed that more mattresses had been brought in to the facility.  (*Id.*)  They observed women exposing their breasts, men

---

[5]
    The Court assumes that Plaintiffs have standing to make a facial challenge to the Ordinance on Fourth Amendment grounds, although no court has squarely resolved the question of whether a party can assert such a challenge to a statute permitting warrantless administrative searches.  *See S & S Pawn Shop v. City of Del City*, 947 F.2d 432, 439-440 (10th Cir. 1991)(declining to resolve the issue); *Le v. City of Citrus Heights*, No. Civ. S-98-2305, 1999 WL 420158 (E.D. Cal. June 15, 1999)(noting that the issue is unresolved).

[6]
    They had previously emailed the club's website to be placed on the guest list.

fondling and making oral contact with women's breasts, women performing oral sex acts on male patrons, and couples and groups of people engaging in sexual intercourse, oral sex and masturbation. (*Id.*)  They also saw several individuals watching other patrons engage in sexual acts.  (*Id.*)  On this night, other patrons propositioned Holmes and Landay for sexual acts.  (Holmes Cert., Landay Cert.)  They acquired two issues of "Swingers Direct" magazine, as well as several flyers, which were displayed for the patrons to take without charge.  (Smith Cert.)

Holmes and Jason Gittens, a Township police officer, visited the club on May 5 and May 12, 2001, and observed similar activities.  (Holmes Cert., Gittens Cert., Def. Br. Ex. O.)  On May 5, 2001, Holmes and Gittens were required to fill out applications for membership in the John Adams Club and give their driver's licenses to the club attendant for copying.  (*Id.*)  They also paid a sixty dollar entrance fee.  (*Id.*)  Gittens estimated that there were approximately one hundred to one hundred and fifty patrons at the club by the end of the evening of May 5, 2001.  (*Id.*)

On May 12, 2001, Holmes and Gittens were asked whether they had previously visited the club and their names were checked against a printed registry.  (*Id.*)  They again paid a sixty dollar entrance fee.  (*Id.*)  They observed patrons engaging in a

9

variety of sexual activities.  (*Id.*)  Holmes and Gittens discovered that the manager of the club, a man later identified as Joseph Patrlja, was present.  (*Id.*)  On this night, Holmes and Gittens identified themselves as police officers, and other officers then entered the club.  (*Id.*)  They took photographs of several of the guests engaging in sexual acts, and ordered the patrons to get dressed and vacate the premises.  (*Id.*)

Individuals affiliated with Plaintiffs' establishment were charged with violating the Ordinance, but those charges were dismissed by the Superior Court, Camden County.[7]  Plaintiffs' voluntarily ceased operating their business after the May 12, 2001, police raid.  Plaintiffs filed a Complaint against the Township of Gloucester on March 10, 2004, alleging that the Ordinance violated their substantive due process, First, Fourth and Fourteenth Amendment rights on its face and as applied to them.[8]  They seek a declaratory, injunctive and monetary relief. The parties have filed cross-motions for summary judgment on the case in its entirety.

---

[7]   Neither party has provided the Court with any details regarding the criminal proceedings, including the names of the individuals charged.  This Court also does not know the nature of the relationship between the three Plaintiffs, nor how any of the individuals charged were affiliated with Plaintiffs.

[8]   In their briefs on the instant motions, however, Plaintiffs appear to have dropped their as-applied claims.

**II.**

Under Fed. R. Civ. P. 56(c) a court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party may not simply rest on its pleadings to oppose a summary judgment motion but must affirmatively come forward with admissible evidence establishing a genuine issue of fact. *Id.*

In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The role of the court is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

**III.**

Plaintiffs' Complaint and the summary judgment motions raise several issues that have not been squarely addressed by the

11

Supreme Court or the Third Circuit.  The parties have asked this Court to determine whether the privacy right articulated by the Supreme Court in *Lawrence v. Texas* encompasses the activities occurring in Plaintiffs' establishment.  Plaintiffs' Complaint also travels into some of the more uncharted areas of the Supreme Court's First Amendment standing jurisprudence.  Moreover, these thorny issues are presented to the Court in the form of a facial challenge, and thus we are deprived of a concrete factual setting in which to test the constitutionality of the Ordinance.

Before the Court addresses the main substance of the parties' arguments, we will address two preliminary issues. First, Plaintiffs maintain that the Ordinance, as originally adopted and in effect when they applied for a Mercantile License, did not require them to obtain an Adult Use Establishment License.  They argue that the definition of adult entertainment cabaret did not encompass their business because they merely permitted sexual activity on the premises and did not "affirmatively offer sexual entertainment as a part of its standard operation."[9]  (Pl. Reply Br. at 8.)  Given the fact that Plaintiffs' establishment devoted a significant amount of space,

---

[9]   At the time Plaintiffs applied for a Mercantile License, the definition of an adult entertainment cabaret included those businesses which featured people appearing in a state of nudity, and live performances characterized by exposure of specified anatomical areas or specified sexual activity.  During the investigation of Plaintiffs' establishment by the police and CCPO, the Ordinance was amended to include businesses which permitted such activities.

12

including mattresses and specially partitioned rooms, to areas where patrons could engage in sexual activity, it can hardly be argued that the business did not feature such activities. It thus falls within the ambit of the Ordinance both as originally adopted and as amended.

It is important to emphasize that the Ordinance does not impose a total ban on adult use establishments within the Township. The Supreme Court's decision in *Schad v. Borough of Mt. Ephraim*, 452 U.S. 61 (1981), clearly indicates that the First Amendment would bar such an ordinance. However, "[t]he mere fact that the commercial exploitation of material protected by the First Amendment is subject to zoning and other licensing requirements is not a sufficient reason for invalidating these ordinances." *Young v. Am. Mini Theatres, Inc.,* 427 U.S. 50, 62 (1976). After careful consideration of the applicable law and for the reasons set forth below, the Court concludes that the Township is entitled to judgment as a matter of law, and correspondingly, Plaintiffs' motion for summary judgment must be denied.

## A.   Substantive Due Process

In *Lawrence v. Texas*, 539 U.S. 558 (2003), the Supreme Court held that the right to privacy encompasses decisions regarding

13

private, consensual sexual conduct.  The Court stated that
"[l]iberty presumes an autonomy of self that includes freedom of
thought, belief, expression, and certain intimate conduct."
*Lawrence*, 539 U.S. at 562.  Overturning the decision in *Bowers v.
Hardwick*, 478 U.S. 186 (1986), *Lawrence* concluded that Texas' law
criminalizing sexual intimacy by same-sex couples violated the
Due Process Clause of the Fourteenth Amendment.

Plaintiffs maintain that the *Lawrence* decision reflects the
fact that "[t]he liberties guaranteed by substantive due process
have moved out of the marital bedroom and *into the public sphere
of commercial interactions* and private interactions between
consenting adults."  (Pl. Br. at 4.) (Emphasis added.) They
interpret *Lawrence* as "suggesting that practically all choices
made by consenting adults regarding their own sexual practices
were a matter of personal liberty and thus beyond the reach of
state control."  (Pl. Br. at 7.)  Plaintiffs contend that the
sexual activities of their patrons are included within *Lawrence*'s
scope because their business is a private establishment.  (Pl.
Br. at 9.)  Therefore, they argue that the Ordinance intrudes
upon the privacy of their patrons by requiring a license for the
New Club Fiji to operate.  (Pl. Br. at 9.)

This Court does not accept Plaintiffs' interpretation of
*Lawrence*.  The Supreme Court placed special emphasis on the

private nature of the conduct and setting at issue in *Lawrence*.
Justice Kennedy, writing for the majority, stated that the
"beginning point" for the analysis of the substantive reach of
liberty under the Due Process Clause was the Court's decision in
*Griswold v. Connecticut*, 381 U.S. 479 (1965).  *Griswold*
"described the protected interest as a right to privacy and
placed emphasis on the marriage relation and the protected space
of the marriage bedroom."  539 U.S. at 564 (invalidating a state
law prohibiting the use of contraceptives).

Justice Kennedy noted that later decisions of the Court
extended the reasoning of *Griswold* to protect the rights of
unmarried adults.  539 U.S. at 565-66 (citing *Eisenstadt v.
Baird*, 405 U.S. 438 (1972)(invalidating state law prohibiting
distribution of contraceptives to unmarried persons); *Roe v.
Wade*, 410 U.S. 113 (1973)(invalidating state law prohibiting
abortion); and *Carey v. Population Services Int'l*, 431 U.S. 678
(1977)(invalidating state law prohibiting sale or distribution of
contraceptives to persons under the age of sixteen)).

The Court singled out for criticism the focus of the *Bowers*
decision on the particular sexual conduct at issue in that case.
Justice Kennedy wrote that the *Bowers* Court "misapprehended the
claim of liberty there presented to it" when it described the
issue to be "whether there is a fundamental right to engage in

15

consensual sodomy."  539 U.S. at 567.  Instead, *Lawrence* emphasized that the case implicated "the most private human conduct, sexual behavior," occurring in "the most private of places, the home."  *Id.*

Justice Kennedy specifically noted that the reasoning of *Lawrence* was not limited to sexual activity within the home, observing that "[f]reedom extends beyond spatial bounds."  *Id.* at 562.  The Court stated that "there are other spheres of our lives and existence, outside the home, where the State should not be a dominant presence."  *Id.*  Although *Lawrence* rejected the idea that such liberty was specifically placed within the home, it emphasized the private nature of the conduct, noting that "[t]he petitioners are entitled to respect for their private lives.  The State cannot demean their existence or control their destiny by making their private sexual conduct a crime."  *Id*. at 578.

The Supreme Court's decision is firmly rooted in principle that government should not intrude into certain types of private, intimate decisions and activities of consenting adults.  Although the Supreme Court stated its decision was not limited to sexual activity in the home, it meant only to expand constitutional protection to other private settings "required to safeguard the right to intimacy involved."  *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67 n.13 (1973).  In the line of decisions discussed

16

by Justice Kennedy, "the constitutionally protected privacy of family, marriage, motherhood, procreation, and child rearing is not just concerned with a particular place, but with a protected intimate relationship."  *Id.*

*Lawrence* reflected this focus on protecting relationships from governmental intrusion.  While declining to set exact boundaries of the term "relationship," the Court stated:

> It suffices for us to acknowledge that adults may choose to enter upon this relationship in the confines of their homes and their own private lives and still retain their dignity as free persons. When sexuality finds overt expression in intimate conduct with another person, the conduct can be but one element in a personal bond that is more enduring.  The liberty protected by the Constitution allows homosexual persons the right to make this choice.

539 U.S. at 567.  Contrary to Plaintiffs' suggestion, *Lawrence* did not recognize a broad right to engage in sexual conduct outside of private settings.

While there has been much dispute as to the exact contours of the right recognized in *Lawrence*, the Supreme Court did not hold that government cannot regulate any consensual sexual activity between adults.  539 U.S. at 578 ("The present case . . . does not involve public conduct or prostitution.") Moreover, the Supreme Court has previously rejected the argument that sexual conduct involving only consenting adults has any

17

"special claim to constitutional protection." *Paris Adult Theatre I*, 413 U.S. at 68.

Other courts have recognized the limits of *Lawrence*'s reach. In a remarkably similar factual situation, the District of Arizona concluded that the constitutional protection of sexual privacy did not extend to a social club where the patrons engaged in consensual sex. *Fleck and Assocs., Inc., v. City of Phoenix*, 356 F. Supp. 2d 1034, 1039 (D. Ariz. 2005) ("The Supreme Court has held that Due Process protects the privacy of sexual activities between consenting adults in the home or other private places."). The Third Circuit recently overturned a district court ruling that the federal statutes regulating the distribution of obscenity were unconstitutional under *Lawrence*. *U.S. v. Extreme Assocs.*, No. 05-1555, 2005 WL 3312634 (3d Cir. Dec. 8, 2005); *see also Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1238 n.8 (2004) ("There is nothing 'private' or 'consensual' about the advertising and sale of a dildo.")(holding that Alabama law prohibiting the commercial distribution of sexual devices was not unconstitutional under *Lawrence*).

This Court need not decide whether *Lawrence* bars government regulation of a private club where adult patrons engaged in consensual sex, as Plaintiffs' establishment is not private.[10]

---

[10] Plaintiffs do not have standing to assert a privacy claim in their own right, as all three are corporations. *See Browning-Ferris Indus. v. Kelco*

The issue of whether a club is public or private is usually raised in the context of lawsuits alleging violations of civil rights and public accommodations laws.  The factors considered by courts in analyzing such cases, however, are instructive here.

In *Kiwanis International v. Ridgewood Kiwanis Club*, 806 F.2d 468 (3d Cir. 1986), the Third Circuit surveyed cases from New Jersey and across the country, concluding that membership selectivity and selection criteria were the most important factors in determining whether a club was public or private.  *See also U.S. v. Lansdowne Swim Club*, 894 F.2d 83, 85-86 (3d Cir. 1990); *Brounstein v. Am. Cat Fanciers Assoc.*, 839 F. Supp. 1100, 1106 (D.N.J. 1993) ("The touchstone of the determination of whether a membership organization is a 'place of public accommodation' is its selectivity in the admission of its members.")

At Plaintiffs' establishment, the admission procedures varied from night to night.  At minimum, a person attempting to gain admittance to the club must have previously sent an email with his or her name to the club in order to be placed on the guest list, and must be able to verify his or her identity.  Male patrons must be accompanied by one or more female patrons,

---

*Disposal, Inc.*, 492 U.S. 257, 284 (1989).  The Court concludes that Plaintiffs have standing to assert the privacy claims of their patrons.  *Craig v. Boren*, 429 U.S. 190, 192-97 (1976); *Extreme Assocs.*, 2005 WL 3312634 at *4.

although women may enter on their own.  On some nights, prospective patrons were required to fill out membership applications, which called for basic biographical data such as name, address, driver license and social security numbers.[11] (Def. Ex. J.)  After investigators filled out applications, they were granted immediate entry to the club.  Entrants were also asked to pay an entrance fee on some occasions but not others. No membership cards were given out.

The membership and admissions process of Plaintiffs' establishment does not rise to the level of those practices considered hallmarks of a private club.  The membership criteria here are less rigorous than those found to be "not genuinely selective" in *Landsdowne Swim Club*.  894 F.2d at 85.  Other courts have found that clubs with similar membership practices are not sufficiently selective to qualify as private clubs.  *See id.*;  *Fleck*, 356 F. Supp. 2d at 1040.

A closer look at the membership practices of clubs found to be private illustrates how Plaintiffs' establishment falls short of the mark.  In *Kiwanis International*, the Third Circuit examined the selectivity of the Ridgewood Kiwanis club and concluded that the organization was private.  806 F.2d at 475-77.

---

[11] The only non-routine question on the application asked if the applicant had ever been convicted of any crimes such as prostitution, indecent exposure or sexual assault.

The Court focused on the small and stable membership of the club (twenty eight total members, of which ten had been members for over twenty years), rigorous selection criteria (member candidates must be sponsored by a current member, willing to pray at meetings and recite the pledge of allegiance, and meet other local and national requirements) and lack of advertisement for new members. *Id.*

By contrast, it appears that Plaintiffs' establishment had several hundred patrons attracted through advertisements on the internet. (Def. Br. Ex. J.)  Moreover, there is no evidence that the "members" of Plaintiffs' establishment had any role in the management of the club or any say in the admissions process. *See Recreational Devs. of Phoenix, Inc., v. City of Phoenix*, 83 F. Supp. 2d 1072, 1083-84 (D. Ariz. 1999)(holding that clubs where members were permitted to engage in or observe sex acts with other members were not private establishments); *Clover Hill Swimming Club v. Goldsboro*, 47 N.J. 25, 33-34 (1966)(holding that swimming club was a place of public accommodation).

Plaintiffs' establishment is a for-profit business catering to a group of people with a particular shared interest.  The Court notes that Plaintiffs' establishment "does not owe its existence to the associational preferences of its members but to the coincidence of their interest in the facilities offered by

21

the owners." *Clover Hill*, 47 N.J. at 34; *see also Recreational Devs.*, 83 F. Supp. 2d at 1084.  Plaintiffs' self-serving characterization of their club as private is not determinative, nor is their bare statement that their patrons have an expectation of privacy on the premises.

The Supreme Court held in *Paris Adult Theatre I* that:

> [t]he idea of a 'privacy' right and a place of public
> accommodation are, in this context, mutually exclusive.
> Conduct or depictions of conduct that the state police
> power can prohibit on a public street do not become
> automatically protected by the Constitution merely
> because the conduct is moved to a bar or a 'live'
> theater stage, any more than a 'live' performance of a
> man and woman locked in a sexual embrace at high noon
> in Times Square is protected by the Constitution
> because they simultaneously engage in a valid political
> dialogue.

413 U.S. at 66-67.  *Lawrence* did not suggest that the protection of privacy encompassed in the constitutional right to due process extended to sexual activities conducted in public places.  *See Fleck*, 356 F. Supp. 2d at 1041.  Therefore, the Court will grant the Township's motion for summary judgment on Plaintiffs' substantive due process claim, and deny the motion of Plaintiffs on this claim.

## B.  First Amendment

While Plaintiffs may assert the substantive due process claims of their patrons, *see Extreme Assocs.*, 2005 WL 3312634 at

*4, they do not have standing to bring their First Amendment claims, either on their own behalf or that of third parties. Neither Plaintiffs nor their patrons were engaged in any activity that implicates First Amendment concerns.  While conduct with an expressive component may receive constitutional protection, the Supreme Court rejected "the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea." *U.S. v. O'Brien*, 391 U.S. 367, 376 (1968) (affirming conviction of petitioner for burning his selective service registration card).  Having sex, without more, is not expressive conduct protected by the First Amendment.

The Supreme Court held in *Arcara v. Cloud Books* that sexual activity conducted in a store selling and exhibiting sexually explicit materials and movies "manifests absolutely no element of protected expression."  478 U.S. 697, 705 (1986).  Citing its decision in *Paris Adult Theatre I*, the Court noted "the fallacy of seeking to use the First Amendment as a cloak for obviously unlawful public sexual conduct by the diaphanous device of attributing protected expressive attributes to that conduct." *Id.*

Plaintiffs make repeated reference to the "protected expression" going on inside their establishment, however, they do

23

not describe with any specificity the alleged expressive

activity.[12]  It is not clear to this Court what exactly is being

expressed by the conduct occurring at Plaintiffs' establishment.

"It is possible to find some kernel of expression in almost every

activity a person undertakes – for example, walking down the

street or meeting one's friends at a shopping mall - but such a

kernel is not sufficient to bring the activity within the

protection of the First Amendment."  *Dallas v. Stanglin*, 490 U.S.

19, 25 (1989).  The Court will not assume that any "protected

expression" is going on within Plaintiffs' establishment when the

undisputed evidence establishes only that certain conduct is

occurring.

Other courts have concluded or suggested that sexual

conduct, by itself, is not protected by the First Amendment.  The

District of Arizona held in *Recreational Devs.*, 83 F. Supp. 2d at

1089-93, that sexual conduct occurring within several "social

clubs" was not expressive conduct justifying constitutional

protection.  *See also Connection Distrib. Co. v. Reno*, 154 F.3d

281, 289 n.8 (6th Cir. 1998)("the First Amendment also would not

protect the right to engage in the depicted sexual conduct

---

12
    Plaintiffs cite to a police report submitted by the Township which
indicates that two magazines and sixteen flyers were taken by investigators
from the club on April 21, 2001.  (Def. Ex. K)  However, as the Supreme Court
noted in *Arcara*, "First Amendment values may not be invoked by merely linking
the words 'sex' and 'books.'"  478 U.S. at 705.

publicly under the theory that the sexual act itself constitutes protected expression"); *Mitchell v. Comm'n on Adult Entm't Estab.*, 10 F.3d 123 (3d Cir. 1993)(rejecting First Amendment challenge to ban on closed viewing booths for sexually explicit films enacted to combat the incidence of sexual activity in closed booths); *O'Connor v. City and County of Denver*, 894 F.2d 1210, 1218 (10th Cit. 1990)("participation in public sex acts is not commonly associated with any constitutionally protected expression").

The fact that Plaintiffs and their patrons are not themselves engaged in any activity protected by the First Amendment does not end the inquiry, as Plaintiffs bring a facial challenge to the Ordinance.  The Supreme Court does not require litigants to have applied for a license in order to bring a facial challenge to a licensing ordinance.  *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 756 (1988).  Plaintiffs did not apply for a license under the Ordinance.

In the First Amendment context, the Supreme Court has relaxed the traditional rules regarding standing to permit litigants to challenge facially overbroad statutes "not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from

25

constitutionally protected speech or expression." *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also Virginia v. Hicks*, 539 U.S. 113, 118-19 (2003).  Facial overbreadth attacks have been allowed where a litigant argues that a licensing ordinance vests a government official with standardless discretion over whether to permit or deny expressive activity, *see City of Lakewood*, 486 U.S. at 755-59, or that a statute places improper restrictions on the time, place and manner of expressive conduct, *see Grayned v. City of Rockford*, 408 U.S. 104, 114-21 (1972). Plaintiffs argue both that the Ordinance vests Township officials with unbridled discretion and that it imposes improper time, place and manner restrictions on protected expression.

The Supreme Court has warned that application of the overbreadth doctrine is "strong medicine . . . employed sparingly and only as a last resort." *Broadrick*, 413 U.S. at 613.  No precise lines have yet been drawn regarding the availability of facial overbreadth challenges, but it is clear that the Supreme Court has envisioned some limits.  "[T]here comes a point at which the chilling effect of an overbroad law, significant as though it may be, cannot justify prohibiting all enforcement of that law - particularly a law that reflects 'legitimate state interests in maintaining comprehensive controls over harmful, constitutionally unprotected conduct.'" *Hicks*, 539 U.S. at 119.

The Supreme Court has not yet decided whether facial overbreadth challenges should be available to litigants whose conduct does not involve expressive activity. *See id.* at 120. In *Hicks*, this question was put before the Court, but it declined to address the issue because it was reviewing a decision of the Virginia Supreme Court, a court not bound by the Supreme Court's standing rules. *Id.* *Hicks* noted, however, that is was "leaving for another day the question whether our ordinary rule that a litigant may not rest a claim to relief on the legal rights or interests of third parties . . . would exclude a case [where the litigant did not engage in protected conduct] from initiation in federal court." *Id.* at 121.

Recognizing that the overbreadth doctrine was not intended to be limitless, this Court holds that a plaintiff who has not engaged in some form of expressive conduct cannot bring a facial challenge to a licensing ordinance that may impact the First Amendment rights of other parties not before the court. This small, but significant, limitation on the availability of facial challenges will not undermine the important policy reflected in the overbreadth doctrine that the First Amendment "needs breathing space." *Broadrick*, 413 U.S. at 611.

The overbreadth doctrine reflects a balance between the traditional concerns animating our constitutional standing rules

and the danger that protected speech will be chilled by our efforts to punish or restrict conduct unprotected by the First Amendment.  *See Broadrick*, 413 U.S. at 610-611.  This balance, however, brings about its own social costs in that laws that may be constitutionally applied in particular instances or with limiting constructions are completely barred from enforcement. *See Hicks*, 539 U.S. at 119.

Where, as here, all the relevant facts regarding the actual enforcement of the Ordinance are purely hypothetical, incurring those social costs may not be justified.  Federal courts must not act as "roving commissions assigned to pass judgment on the validity of the Nation's laws."  *Broadrick*, 413 U.S. at 610-11 (citing *Younger v. Harris*, 401 U.S. 37, 52 (1971)).  In an "as-applied" constitutional challenge, a court faces "'flesh and blood' legal problems with data 'relevant and adequate to an informed judgment'."  *New York v. Ferber*, 458 U.S. 747, 768 (1982).  Litigants who have not engaged in any form of expressive conduct invite the courts to engage in mere speculation, forcing our decision-making too far from the "two cardinal principles of our constitutional order: the personal nature of constitutional rights, and prudential limitations on constitutional adjudication."  *Id.* at 767.

In other contexts, the Supreme Court has limited the availability of the overbreadth doctrine when allowing facial challenges is not necessary to further the doctrine's "intended objective" of preventing protected speech from being chilled. *Bates v. State Bar of Ariz.*, 433 U.S. 350, 380-381 (1977)(declining to allow facial overbreadth challenge to bar association rule prohibiting professional advertising); *see also Ferber*, 458 U.S. at 769 ("The scope of the First Amendment overbreadth doctrine . . . must be carefully tied to the circumstances in which facial invalidation of a statute is truly warranted.").  The rule here will impact very few cases, and in fact, other than *Hicks*, this Court has uncovered no other cases where a party seeking the facial invalidation of a statute has itself not engaged in any form of speech or expressive conduct.

## IV.

Even if this Court were to permit Plaintiffs' facial challenge to the Ordinance to go forward, they would not be entitled to the relief they seek.  Plaintiffs allege that no less than ten separate provisions of the Ordinance violate the First Amendment, grouped into two categories: (i) provisions imposing impermissible prior restraints on speech, and (ii) provisions unreasonably regulating the time, place and manner of protected

expression.  The Court concludes that their claims either do not have merit or are not properly before this Court.

### A.  Prior restraint claims

Prior restraints on speech are not *per se* unconstitutional, but there is a "heavy presumption" against the validity of any such provisions.  *FW/PBS, Inc.*, *v. City of Dallas*, 493 U.S. 215, 225 (1990).  The Supreme Court has identified two principal features that render a prior restraint scheme unconstitutional. *Id.* at 225-26; *see also City of Lakewood*, 486 U.S. at 757; *Freedman v. Maryland*, 380 U.S. 51 (1965).  Ordinances which place "unbridled discretion" in the hands of the government decision-maker and do not "set reasonable time limits on the decisionmaker" are constitutionally impermissible.  *FW/PBS*, 493 U.S. at 227.  Plaintiffs argue that six aspects of the Ordinance pose impermissible prior restraints on speech.

1. Prompt issuance

Plaintiffs first argue that the Ordinance does not provide for the prompt issuance of a license.  Section 24.4(D) provides that "[t]he Township Clerk shall approve the issuance of the license within 90 days after receipt of a completed application" unless any of eight enumerated circumstances are found to be

true.  Plaintiffs maintain that the ninety-day deadline is illusory because the Ordinance does not specify what will occur if that deadline is not met.  Citing *Redner v. Dean*, 29 F.3d 1495, 1500-01 (11th Cir. 1994), they argue that to be constitutional, a licensing ordinance must permit the applicant to operate his or her business upon expiration of the specified time period.  Additionally, Plaintiffs contend that the Ordinance's specification that the ninety-day period will begin to run upon receipt of a "completed" application is impermissibly vague.

The Court concludes that Section 24.4(D) is not an unconstitutional prior restraint under *FW/PBS*.  In that case, the Supreme Court invalidated a provision of an adult business licensing ordinance because although it provided that the chief of police "shall approve the issuance of a license" within thirty days of receipt of an application, no license would issue if the premises had not been inspected and approved by the health department, fire department and building official.  493 U.S. at 227.  The challenged ordinance did not give a deadline for when these inspections must take place.  *Id.*

*FW/PBS* expressed no concern with the portion of the provision stating that the chief of police "shall approve the issuance of a license" within thirty days, language nearly

31

identical to the provision of the Ordinance challenged here.
Moreover, the Ordinance specifically addresses the failings
identified in *FW/PBS*, in that it sets time limits for approval by
the zoning officer, building inspector and fire official and
provides that failure of those officials to act shall be deemed
an approval.[13]  (§ 24.3(C)(6)).  *Redner* is not binding upon
courts in the Third Circuit.  This Court concludes that Section
24.4(D) satisfies the requirements as set out by the Supreme
Court in *FW/PBS*.

    The Ordinance is not rendered unconstitutional by the
omission of a definition of "completed application."  Webster's
Third New International Dictionary defines the term "completed"
as "possessing all necessary parts, items, components or
elements" or "not lacking anything necessary."  The Township
provides application forms detailing the information required
from an applicant.  Section 24.3 also sets forth the "[l]icense
required and duties of applicant," further specifying steps that
an applicant must take and information that must be provided.
Given the commonsense definition of the word "completed" and the
fact that the Township provides an application form, it is hard
to comprehend Plaintiffs' argument that the failure to define

---

[13]    This provision was added by amendment in 2003.

32

"completed application" renders the Ordinance unconstitutional.

2. <u>Prompt judicial review</u>

In *City of Littleton v. Z.J. Gifts D-4, LLC*, 541 U.S. 774 (2004), the Supreme Court clarified that the First Amendment required both prompt judicial review and a prompt judicial decision regarding the denial of a license application.  However, *City of Littleton* concluded that no special judicial review rules were required for license denials where the applicable state court procedural rules and practices were sufficient to ensure prompt determination of such cases.  541 U.S. at 781-82.

The New Jersey Civil Practice Rules specifically provide for actions in lieu of prerogative writs to challenge municipal decisions.  N.J. Civ. Prac. R. 4:69-1 *et seq.*  The Civil Practice Rules also provide for interim relief, summary actions and expedited review.  *See* N.J. Civ. Prac. R. 4:52-1 *et seq.*; 4:67-1 *et seq.*  Plaintiffs have not demonstrated that these procedural tools are inadequate to ensure prompt decisions by courts reviewing license denials.  As in *City of Littleton*, this Court has "no reason to doubt the willingness of [New Jersey]'s judges to exercise these powers wisely so as to avoid serious threates of delay-induced First Amendment harm."[14]  541 U.S. at 782.

---
[14]
    The Supreme Court also noted that "whether the courts do so is a matter normally fit for case-by-case determination rather than a facial challenge."

3.  <u>Revocation provisions</u>

Plaintiffs argue that the revocation provisions the Ordinance violate their due process rights by allowing the Township to revoke a license based upon the criminal offenses or other misconduct of individuals other than the owner of an adult use business.  Section 24.12 of the Ordinance provides that the Township Clerk "shall revoke a license if it is determined that a licensee has:"

> C.  An owner and or [sic] employee has knowingly allowed the possess [sic] or sale of a Controlled Dangerous Substance, as defined under the Criminal Code of the State of New Jersey, on the premises.
>
> D.  An owner and or [sic] employee has knowingly permitted violation of a crime described in N.J.S.A. 2C:34-1 et seq., including criminal attempt, conspiracy or solicitation to commit any of the crimes described in N.J.S.A. 2C:34-1 et seq.
>
> E.  An owner and or employee has knowingly operated an Adult Use Establishment during a period of suspension.

Relying on a non-precedential opinion of the Sixth Circuit, Plaintiffs argue that these provisions allow for the unconstitutional revocation of a business owner's license based upon the criminal conduct of his or her employees.  *See Lee v. City of Newport*, No. 91-5158, 1991 WL 227750 (6th Cir. Nov. 5, 1991).

---

541 U.S. at 782.

The ordinance found unconstitutional in *Lee* differs from the Township's Ordinance in a determinative aspect.  The ordinance in *Lee* stated that a license may be revoked:

> (1) If, within twelve months prior to the date on which charges are filed, there has been a conviction of any licensee or his agent, servants or employees, for any action or activity occurring in, on, or at the premises covered by the license, in violation of any provision of this division or any other division of the City of Newport, or of any criminal or penal statute of the Commonwealth of Kentucky against gambling, disorderly conduct, or any other criminal or penal offense. . . .

The Township's Ordinance, however, includes the scienter requirement found lacking in *Lee* in that it specifies that the owner or employee must have knowingly permitted the criminal acts or operated an adult use establishment while suspended.[15]

There is no indication that the Township meant "to enlarge the licensee's vicarious . . . liability beyond traditional bounds."  *Genusa v. City of Peoria*, 619 F.2d 1203, 1221 (7th Cir. 1980)(upholding provision of adult use ordinance allowing revocation of license where licensee or person associated with licensee permitted unlawful activity on premises of business).  Given that *Lee* is not binding on this Court or, in fact, the

---

[15] The Township's Ordinance is also narrower than the ordinance in *Lee*, as revocation may be premised only crimes related to the possession and sale of controlled substances, prostitution and obscenity, or the operation of an adult use establishment during a period of suspension.  At the time the Ordinance was enacted, it also provided that a license may be revoked if an owner or employee has knowingly permitted an act of "specified sexual activity" to occur on the premises.  This provision was removed by amendment in 2003.  Gloucester Township Ordinance O-03-18.

courts of the Sixth Circuit, the Court is hesitant to overturn such a provision upon a facial challenge where the Third Circuit has not spoken and the provision has not yet been employed against these Plaintiffs or any other licensees.  Moreover, the Supreme Court has noted that the "strong medicine" of the overbreadth doctrine "has not been invoked when a limiting construction has been or could be placed on the challenged statute."  *Broadrick*, 413 U.S. at 613.

4.   Undefined terms

     Plaintiffs argue that several terms in the license issuance and suspension provisions are unclear and undefined, leaving the Township Clerk with unbridled discretion in deciding whether to issue or suspend an adult use establishment's license.  In particular, they maintain that the terms "repeated action" and "disorderly conduct" are unclear.  Read in context, the challenged portions of the Ordinance do not give unbridled discretion to the Township Clerk.

     A litigant making a facial overbreadth challenge must demonstrate that any overbreadth is "not only real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  *Broadrick*, 413 U.S. at 615-16.  Words in a statute must "provide explicit standards for those who apply

36

them" and "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited." *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972). "Condemned to the use of words, we can never expect mathematical certainty from our language." *Id.* at 110.

Section 24.4(D)(7) provides that the Township Clerk shall not approve a license if "the applicant has been the operator of or employed by an Adult Use Establishment within the preceding 12 months which has been the subject of repeated action by the Gloucester Township Police Department for violations of this ordinance, disorderly conduct by the patrons, employees or owners."[16] The Ordinance's suspension provision states that the Township Clerk shall suspend a license if it is determined that the licensee has "demonstrated the inability to operate an Adult Use Establishment in a peaceful and law-abiding manner demonstrated by repeated action by the Gloucester Township or State Police department." § 24.11(D).

As the Supreme Court wrote, "[i]t will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" *Id.* at 110 n.15 (quoting *Am. Commc'ns Assn. v. Douds*,

---

16
    Adult use establishment licensees are required to reapply for a license every year. § 24.4(A).

339 U.S. 382, 412 (1950)).  Plaintiffs here attempt to inject uncertainty into terms that in their ordinary usage are otherwise clear terms.  As an initial matter, "disorderly conduct" is clearly defined by New Jersey law.[17]  *See* N.J.S.A. § 2C:33-2.

Given that the overbreadth doctrine "has not been invoked when a limiting construction has been or could be placed on the challenged statute," *Broadrick*, 413 U.S. at 613, the Court's task here is limited.  It is not within the Court's power to construe and narrow municipal ordinances.  *See Grayned*, 408 U.S. at 110. Read in context, the meaning of the other contested terms is not so unclear as to be standardless.

"Repeated" is defined by Webster's Third New International

---

[17]

N.J.S.A. 2C:33-2 defines disorderly conduct as:

a.  Improper behavior. A person is guilty of a petty disorderly persons offense, if with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof he
(1) Engages in fighting or threatening, or in violent or tumultuous behavior; or
(2) Creates a hazardous or physically dangerous condition by any act which serves no legitimate purpose to the actor.

b.  Offensive language. A person is guilty of a petty disorderly persons offense if, in a public place, and with purpose to offend the senesibilities of a hearer or in reckless disregard of the probability of so doing, he addresses unreasonably loud and offensively coarse or abusive language, given the circumstances of the person present and the setting of the utterance, to any person present.

"Public" means affecting or likely to affect persons in a place to which the public or a substantial group has access; among the places included are highways, transport facilities, schools, prisons, apartment houses, places of business or amusement, or any neighborhood.

Dictionary as "renewed or recurring again and again," "constant, frequent" and "said, done, or presented again."  A person of reasonable intelligence would read the term "repeated action" to mean at least more than one action by the police.  Furthermore, the Ordinance specifies that it is concerned with "action . . . for violations of this ordinance, [and] disorderly conduct . . . ."  § 24.4(D)(7).  A person of reasonable intelligence would read the Ordinance as specifying that a license must be denied in the event the police have more than once taken the type of action called for by the specified offenses of ordinance violations and disorderly conduct.

Contrary to Plaintiffs' assertion that the term "peaceful," as used in the license suspension provision, is undefined, the language of Section 24.11(D) provides its own definition.  The Ordinance specifies that "[t]he inability to operate an Adult Use Establishment in a peaceful and law-abiding manner" is demonstrated by "repeated action by the Gloucester Township or State Police department."  § 24.11(D).

While the language of the Ordinance may not be precise to a mathematical certainty, it is not so unclear as to render the statute overbroad in a way that is "not only real, but substantial as well, judged in relation to the statute's plainly legitimate sweep."  *Broadrick*, 413 U.S. at 615-16.

5.  <u>Signage and civil disability provisions</u>

Even if this Court had held that Plaintiffs could bring a facial challenge although they were not engaged in any expressive conduct, Plaintiffs still would not have standing to bring a facial challenge to the signage and civil disability provisions of the Ordinance.

Plaintiffs argue that the signage and advertising provisions of the ordinance[18] do not meet the First Amendment standard for commercial speech restrictions as set out in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980). In the context of commercial speech, however, the "strong medicine" of a facial challenge is generally not warranted. "Since advertising is linked to commercial well-being, it seems unlikely that such speech is particularly susceptible to being crushed by overbroad regulation." *Bates*, 433 U.S. at 381; *see also Central Hudson*, 447 U.S. at 564 n.6 ("[C]ommercial speech, the offspring of economic self-interest, is a hardy breed of expression that is not 'particularly susceptible to being crushed by overbroad regulation.'"); *The Pitt News v. Fisher*, 215 F.3d 354, 365 (3d Cir. 2000).  Plaintiffs have raised no argument or evidence that persuades this Court to deviate from the general

---

[18]  *See* § 24.7(C), (E).

40

rule that facial challenges are not permitted for commercial speech restrictions.

Plaintiffs also contend that Section 24.4(D)(8), which bars the issuance of a license to anyone convicted of a sexual offense, public indecency (or the attempt, conspiracy to commit or solicitation of such crimes), or endangering the welfare of a child,[19] is "constitutionally suspect."  In order to have standing to challenge such a provision, the litigant must demonstrate that he or she has been convicted of one of the enumerated crimes.  *FW/PBS*, 493 U.S. at 234.  Plaintiffs do not allege that they have been convicted of any of the enumerated offenses, and therefore lack standing to challenge this section of the Ordinance.

### B.   Time, place and manner restrictions

While content-based speech regulations are presumptively invalid under the First Amendment, content-neutral[20] regulations which address the time, place and manner of speech are constitutional as long as: (1) they are justified without

---

[19]
   *See* N.J.S.A. § § 2C:34-1 *et seq.*, 2C:14-1 *et seq.*, and 2C:24-4.

[20]
   The Supreme Court has held that ordinances regulating adult-oriented businesses are content-neutral so long as they are aimed at addressing the "secondary effects" such businesses have on the community.  *See City of Renton*, 475 U.S. at 47-49; *Am. Mini Theatres*, 427 U.S. at 70-71.

reference to the content of the regulated speech; (2) they are narrowly tailored to serve a significant or substantial governmental interest; and (3) they leave open ample alternative avenues of communication. *Mitchell,* 10 F.3d at 130-31; *see also City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46-47 (1986).

Plaintiffs do not contest that the provisions of the Ordinance regarding loudspeakers, lighting, and hours of operation are content-neutral time, place and manner restrictions. Moreover, they concede that the Ordinance is designed to serve the Township's substantial governmental interest in regulating adult businesses to address the secondary effects on the community of such establishments.[21]  (Pl. Reply Br. at 11.)  They maintain, however, that these regulations are "unreasonable." (Pl. Br. at 22.)

1.  Loudspeakers

While Section 24.7(D), the provision of the Ordinance regarding loudspeakers, is not a model of clarity in drafting,[22]

_____

[21]
Several courts have also recognized that regulating sexual activity in public adult entertainment establishments is a legitimate substantial governmental interest. *Ben Rich Trading, Inc., v. City of Vineland*, 126 F.3d 155, 164 (3d Cir. 1997); *Chez Sez VII, Inc., v. Poritz*, 297 N.J. Super. 331 (App. Div. 1997).

[22]
It reads as follows: "No loudspeakers or exterior sound equipment shall be

it is clearly aimed at prohibiting the use of loudspeakers or
other sound equipment on the exterior of buildings housing adult
use establishments.  Such regulations are clearly permissible.
*See, e.g., Ward v. Rock Against Racism*, 491 U.S. 781 (1989).
Plaintiffs are correct that it is possible to parse the imprecise
wording of the provision to make it appear to read that all
loudspeakers, whether employed inside or on the exterior of a
building, are prohibited.  The Township has denied that the
provision was ever intended to reach such a result.

A constitutional challenge would be more appropriately
brought in the unlikely event that the Township abides by
Plaintiffs' tortured interpretation of the provision, rather than
in the vacuum presented here.  Moreover, to the extent that this
regulation affects commercial speech, a facial challenge is
inappropriate here.  *Bates*, 433 U.S. at 380-81.


2.  Lighting

Section 24.7(B) provides that "[t]he interior of an Adult
Use Establishment shall be adequately lighted and constructed so
that every portion thereof is readily visible to the attendant or
other supervisory personnel from the counter or other regular
stations."  Plaintiffs argue that the term "adequately lighted"
is impermissibly vague.  However, the term must be read in the

---

used in Adult Use Establishments." § 24.7(D).

context of the entire provision, and in doing so its meaning is clear.  The lighting must be sufficient to allow any attendent or supervisory personnel a view of all portions of the facility of the adult use establishment.

Moreover, the provision specifies that the facility must be "adequately lighted *and constructed.*" (Emphasis added.)  The fact that the New Club Fiji's interior configuration does not allow an attendant to view the entire premises, regardless of the lighting level, simply illustrates that the facilities do not meet the requirements of the Ordinance and does not cast doubt on the constitutionality of Section 24.7(B).  *See Ben Rich Trading, Inc., v. City of Vineland*, 126 F.3d 155, 163-65 (3d Cir. 1997)(upholding municipal ordinance requiring conversation booths in adult businesses to be open on one side so that they do not facilitate sexual activity); *Mitchell*, 10 F.3d at 140-44 (3d Cir. 1993)(upholding Delaware open booths statute); *Chez Sez VII, Inc., v. Poritz*, 297 N.J. Super. 331, 348-350 (App. Div. 1997)(upholding New Jersey statute prohibiting viewing booths in adult businesses that preclude visibility by an attendant).

3.  Hours of operation

Section 24.8(C) of the Ordinance provides that adult use establishments shall not be open for business earlier than 9:00

44

a.m. or later than 10:00 p.m. on weekdays and Saturdays, and must remain closed on Sundays.  Plaintiffs argue that this restriction on hours of operation is not narrowly tailored and does not leave open ample alternative channels of communication.  The Third Circuit, however, has upheld similar hours of operations restrictions on several occasions.

In *Mitchell*, the Third Circuit upheld a Delaware statute restricting the hours of operation of adult businesses from 10:00 a.m. to 10:00 p.m. on Mondays through Saturdays.  10 F.3d at 131-40.  The Court concluded that "[t]he amendment allows those who choose to hear, view or participate publicly in sexually explicit expressive activity more than thirty-six hundred hours per year to do so.  We think the Constitution requires no more."  *Id.* at 139.  Here, the Ordinance permits adult use establishments to be open more than four thousand hours per year.  *See also Ben Rich Trading*, 126 F.3d at 160-63 (upholding ordinance limiting open hours from 8:00 a.m. to 10:00 p.m., Mondays through Saturdays).  Plaintiffs have presented no evidence that suggests the result should be any different here.

## V.

Plaintiffs argue that the Ordinance violates their Fourth Amendment right to be free from unreasonable searches,

45

maintaining that the inspection provisions permit warrantless searches of their establishment.[23]  These provisions state that the applicant, licensee, owner or operator of an adult use establishment must permit inspections of the premises by the Township Zoning Officer, Building Inspector or Health Officer "at any reasonable time it is occupied or open for business, to for [sic] the purpose of insuring compliance with this Ordinance." § 24.9(A).  Refusal to permit a "lawful inspection" is deemed to be a violation of the Ordinance and is grounds for a suspension of the business' license.  §§ 24.9(B), 24.11(C).  If a license is suspended more than once within a year due to the licensee's refusal to permit an inspection, the Township must revoke the license.  § 24.12(A).

As an initial matter, the Fourth Amendment does not require a warrant for inspections of the portions of commercial premises that are open and visible to the public.  *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 315 (1978); *Ellwest Stereo Theater, Inc., v. Boner*, 718 F. Supp. 1553, 1577 (M.D. Tenn. 1989).  Given this Court's holding that Plaintiffs' business is a public, and not

---

[23]

   The Court assumes without deciding that Plaintiffs have standing to make a facial challenge to the Ordinance on Fourth Amendment grounds, although no court has squarely resolved the question of whether a party can assert such a challenge to a statute permitting warrantless administrative searches.  *See S & S Pawn Shop v. City of Del City*, 947 F.2d 432, 439-440 (10th Cir. 1991)(declining to resolve the issue); *Le v. City of Citrus Heights*, No. Civ. S-98-2305, 1999 WL 420158 (E.D. Cal. June 15, 1999)(noting that the issue is unresolved).

private, establishment, to the extent that the Ordinance permits warrantless inspections of the areas of the club open to the club's customers it does not offend the Fourth Amendment. *See Ellwest*, 718 F. Supp. at 1577 (upholding warrantless inspection provision of municipal ordinance regulating adult businesses to the extent that inspections were limited to the public parts of the business).

Two aspects of the provision merit further discussion. First, Plaintiffs argue that the qualifying term "at any reasonable time it is occupied or open for business" is too broad.  Similar language has been found constitutional by other courts. *See Ellwest*, 718 F. Supp. at 691 (upholding ordinance permitting "unlimited inspections, at reasonable times"); *see also Ky. Rest. Concepts, Inc., v. City of Louisville*, 209 F. Supp. 2d 672 (W.D. Ky. 2002)(holding ordinance inspection scheme unconstitutional but noting that addition of "at reasonable times" language as in *Ellwest* would correct the defect).  Given that the touchstone of the Fourth Amendment is reasonableness, this Court cannot conclude that the inspection provisions are facially invalid in this respect.

Next, Plaintiffs argue that the Ordinance requires them to permit warrantless inspections of the non-public areas of their business, such as the office area.  Looking at the several

47

inspection provisions as a whole, however, the Court determines that the Ordinance is not facially invalid.  The issue presents a close question that would best be resolved in an as-applied challenge, where the Court would have evidence of the actual application of the Ordinance.

Section 24.9(B) provides that the refusal to permit a "*lawful* inspection" is a violation of the Ordinance, and thus would trigger its suspension and revocation provisions. §§ 24.9(B), 24.11(C), 24.12(A) (emphasis added).  A licensee could refuse to permit an *unlawful* inspection, however, without violating the Ordinance.  A warrantless inspection of the non-public areas of a commercial establishment violates the Fourth Amendment.  *See, e.g., Marshall*, 436 U.S. at 312.  The terms of the Ordinance thus leave room for a licensee to resist unlawful warrantless inspections without punishment.  By contrast, the provision of adult business ordinance overturned in the case relied upon by Plaintiffs, *J.L. Spoons, Inc., v. City of Brunswick*, contained no such limiting language when it stated that failure to permit an inspection constituted a misdemeanor and grounds for the suspension of a license.  49 F. Supp. 2d 1032, 1039-40 (N.D. Ohio 1999).

Although the Court cannot conclude that the inspection provisions of the Ordinance are facially invalid, a renewed

48

challenge may later be appropriate should the Township apply these provisions in a manner that violates the Fourth Amendment.

## VI.

For the reasons set forth above, the Court will grant Defendant Township of Gloucester's Motion for Summary Judgment, and deny the Motion for Summary Judgment of Plaintiffs 832 Corporation, 225 Corporation and the John Adams Club.  The Court will enter an appropriate order.


Date: December 12th, 2005

s/ Joseph E. Irenas

_____
JOSEPH E. IRENAS
Senior United States District Judge